UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

KENNETH ROBERTS and NICHOLAS VALNER,
individually and on behalf of the Estate of
George Harrison, deceased,

                            *Plaintiffs,*

-*against*-

GILBERT LEDERMAN, individually and as guardian
on behalf of his minor children Ariel Lederman, Daughter
Lederman 1 and Daughter Lederman 2 and STATEN
ISLAND UNIVERSITY HOSPITAL,

                            *Defendants.*

-------------------------------------------------------------------------x

No. 04 CV 0033 (NGG) (RLM)

**AMENDED
COMPLAINT**

**JURY TRIAL
DEMANDED**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

JAN 1 3 2004

BROOKLYN OFFICE

Plaintiffs Kenneth Roberts and Nicholas Valner individually and on behalf of the

Estate of George Harrison, by their attorneys, Sonnenschein, Nath & Rosenthal LLP, as and for their

complaint in this action, alleges as follows:

## PRELIMINARY STATEMENT

      1.     George Harrison was a renowned musician, songwriter and recording artist

whose career spanned four decades.  Prior to the time of his death in November 2001 after a

prolonged battle with cancer, Mr. Harrison had achieved great critical acclaim and worldwide

popularity both as a member of The Beatles and as a solo artist.  Kenneth Roberts and Nicholas

Valner, bring this suit individually and on behalf of the Estate of George Harrison.

      2.     During the last weeks of his life, Mr. Harrison sought medical care from

Defendants Dr. Gilbert Lederman ("Dr. Lederman") and Staten Island University Hospital

("SIUH").  In addition to his medical treatment, of critical importance for the peace of Mr.

Harrison was the need to maintain absolute confidentiality about his presence at SIUH.

Accordingly, Mr. Harrison checked into the hospital under an alias and Dr. Lederman and SIUH

were instructed not to discuss their connection to Mr. Harrison under any circumstances.

        3.     Despite repeated warnings that Mr. Harrison's privacy must be protected, and

despite specific promises to keep all aspects of contact with Mr. Harrison strictly confidential,

Dr. Lederman and SIUH deliberately disclosed confidential and private information about Mr.

Harrison obtained as a result of his treatment. Indeed, Mr. Harrison's presence at SIUH was

almost immediately leaked to the press, and thereafter Dr. Lederman conducted interview after

interview on national television and in national publications discussing Mr. Harrison's condition

and treatment and other confidences, both before and after Mr. Harrison's death. These

unauthorized disclosures were cynically used as a means of promoting Dr. Lederman and SIUH.

These gross breaches of confidence resulted in a "circus atmosphere" for Mr. Harrison and his

family in his last days at SIUH and caused him great anxiety, additional discomfort and suffering

at a time when he was most vulnerable.

        4.     Perhaps most egregious, Dr. Lederman preyed upon Mr. Harrison while he

was in a greatly deteriorated mental and physical condition by coercing Mr. Harrison to

autograph a guitar and two cards as Mr. Harrison was being prepared to leave Dr. Lederman and

SIUH's care. Dr. Lederman thereby abused his position as a physician to create unique

collectors' items of enormous value. Shortly after Mr. Harrison's death, Dr. Lederman gave a

story about the guitar to the *National Enquirer*. The article featured a photograph of the doctor's

son – Ariel Lederman – holding the valuable trophy, which Dr. Lederman described as

containing "probably the very last [autograph Mr. Harrison] ever wrote."

        5.     Significantly, on November 25, 2003, after a year-long inquiry into Dr.

Lederman's conduct, the New York State Department of Health Office of Professional Medical

- 2 -

Conduct ("OPMC") censured, reprimanded and fined Dr. Lederman for divulging Mr. Harrison's confidential medical information.

6.     As a result of Defendants' wrongful conduct, Plaintiffs seek: damages for the disclosure of Mr. Harrison's confidential information in violation of the duties Dr. Lederman and SIUH owed to Mr. Harrison; damages for breach of their oral contract to maintain Mr. Harrison's confidentiality; damages for the unjust enrichment of both Dr. Lederman and SIUH as a result of the publicity and free media time generated by disclosure that Mr. Harrison was being treated by Dr. Lederman at SIUH; damages for the emotional distress that resulted from Dr. Lederman and SIUH's grossly improper behavior and surrender of the guitar and the cards signed by Mr. Harrison as a result of Dr. Lederman's coercive behavior.

## PARTIES

7.     Plaintiffs Kenneth Roberts and Nicholas Valner are subjects of the United Kingdom.  They are the Executors of the Estate of George Harrison, who, at the time of his death in November 2001, was a subject of the United Kingdom.

8.     Defendant Gilbert Lederman, on information and belief, is a citizen of the State of New York residing at 304 Douglas Road, Staten Island, NY 10304.  He is the parent of minor children Ariel Lederman ("Ariel"), Daughter Lederman 1 ("Daughter 1") and Daughter Lederman 2 ("Daughter 2").  The given names of Daughter 1 and Daughter 2 are unknown to Plaintiffs at this time.  On further information and belief,  Ariel, Daughter 1 and Daughter 2 are citizens of the State of New York residing at 304 Douglas Road, Staten Island, NY 10304.

9.     Defendant Staten Island University Hospital, on information and belief, is a not-for-profit corporation incorporated under the laws of the State of New York having its principal place of business at 475 Seaview Avenue, Staten Island, NY 10305.

9901540\V-3

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.

11.     Venue is appropriate in this District as all of the Defendants reside in this District and the majority of events giving rise to the claims asserted herein occurred in this District.

## FACTUAL BACKGROUND

12.     Prior to his engagement as Mr. Harrison's doctor in October, 2001, Defendants Dr. Lederman and SIUH had engaged in extensive advertising to promote treatments that Dr. Lederman, a radiation oncologist, conducted at SIUH.  In the press and other media, including radio commercials featuring Dr. Lederman, these advertisements promoted a technique Dr. Lederman calls "stereotactic radiosurgery" that Dr. Lederman and SIUH claim is effective in the treatment of cancer.

13.     In October of 2001, Dr. Lederman, flew to Switzerland to meet with Mr. Harrison.  Mr. Harrison had had cancer for several years, and at the time of Dr. Lederman's visit the disease had advanced to such a stage that conventional treatments were of doubtful benefit.

14.     While in Switzerland, Dr. Lederman promoted his technique to Mr. Harrison and his wife, Olivia (collectively, the "Harrisons") and discussed various issues relating to treatment.  The Harrisons also discussed with Dr. Lederman the importance of maintaining the privacy of Mr. Harrison and the confidentiality of his treatment.  There had been breaches of his privacy while Mr. Harrison was being treated in Switzerland and the Harrisons instructed Dr. Lederman to be highly sensitive to these concerns.

- 4 -

15.     Shortly after Dr. Lederman arrived in Switzerland, the Harrisons and Dr. Lederman flew to New York on a jet the Harrisons had chartered so that Mr. Harrison could begin treatment with Dr. Lederman at SIUH.

16.     Again during the flight from Switzerland to New York, the Harrisons and Dr. Lederman discussed issues not only related to Mr. Harrison's condition and medical care, but also his privacy needs.  Specifically and repeatedly, the Harrisons told Dr. Lederman that because he was an extremely well known celebrity, Mr. Harrison's confidentiality and privacy had to be protected with the utmost respect.  Dr. Lederman agreed that he would act with great discretion and would not reveal any information about Mr. Harrison he obtained while treating him.

17.     Mr. Harrison began to receive treatment with Dr. Lederman at SIUH on or about October 21, 2001.

18.     During the course of Dr. Lederman's diagnostic work in New York, he and Mr. Harrison discussed issues related to treatment, cancer, and Mr. Harrison's perspectives on life and death as they related to Dr. Lederman's care.  All of these discussions were in the context of medical care, and, as a result, Mr. Harrison had every expectation of total confidentiality.

19.     In addition to reiterating the clear obligations of confidentiality that were imposed on Dr. Lederman by the rules of the doctor-patient relationship, Mr. Harrison and others acting on his behalf made Dr. Lederman well aware of Mr. Harrison's especially keen interest in security and privacy as a world renowned celebrity, and in the confidentiality of information as personal as habits, spiritual beliefs, philosophical issues as they related to health and sickness, life and death and other matters.

- 5 -

9901540\V-3

20.     Moreover, Dr. Lederman was aware that all nurses and subordinate hospital staff were required to sign confidentially commitments and that the Harrisons had retained private security personnel who protected Mr. Harrison both while he was at SIUH and at the nearby private home where he stayed.

21.     Likewise, SIUH was made aware of Mr. Harrison's particular concerns about privacy and confidentiality through meetings between the hospital's Director of Security and the private security personnel retained by the Harrisons.

22.     With regard to press inquiries, Dr. Lederman and SIUH were specifically instructed that under no circumstances was there to be any release of information whatsoever regarding Mr. Harrison. In fact, Defendants were told that they were to have no conversations with the press relating to whether Mr. Harrison was a patient at SIUH. These requirements were specifically and repeatedly reiterated to both Dr. Lederman and SIUH by Mr. Harrison and the private security personnel he retained.

23.     Notwithstanding these confidentiality obligations, during Mr. Harrison's stay at SIUH, he was visited by doctors and medical personnel who had nothing to do with his treatment because they had become aware of Mr. Harrison's presence at SIUH and were curious to see or meet him.

24.     Moreover, press reports almost immediately began to appear reporting that Mr. Harrison was at SIUH under Dr. Lederman's care. Nearly each such press report referenced the medical expertise of Dr. Lederman and SIUH and many contained direct quotes from Dr. Lederman touting his and SIUH's cancer treatment. Dr. Lederman had these self-serving discussions with the press despite repeated warnings for confidentiality and privacy and to avoid the press in connection with Mr. Harrison.

9901540\V-3

25.     Dr. Lederman then contacted Gavin de Becker ("Mr. de Becker") – a highly respected expert on personal security – whose company provided security consultation and services to the Harrisons, about the possibility of a press conference which would (ostensibly) be about SIUH's cancer center not Mr. Harrison.  Based on common sense and the growing number of reports that Mr. Harrison was being treated by Dr. Lederman at SIUH, however, it was clear to the Harrisons and Mr. de Becker that the draw for members of the media would be the possibility that Dr. Lederman might say something about Mr. Harrison, not the cancer center.

26.     Mr. de Becker specifically informed Dr. Lederman that he was not to hold a press conference as it would be detrimental to his patient, Mr. Harrison.  At this time, Mr. de Becker, acting for Mr. Harrison, again reiterated Mr. Harrison's expectations of complete privacy and confidentiality.  However, Dr. Lederman continued to act as though having George Harrison as his patient was a great testimonial for his already extensively advertised services and he desired to make his connection with George Harrison known in order to attract media attention and thereby promote himself and SIUH.

27.     Finally, on November 11, 2001, Ms. Harrison and Mr. de Becker met with Dr. Lederman to reiterate – on behalf of Mr. Harrison – that there should be no publicity whatsoever in light of both the doctor-patient relationship and Mr. Harrison's repeatedly expressed requirement of privacy and confidentiality.  Dr. Lederman's shocking response was that he wanted to be sure that people learned about the treatment he provided at SIUH and named some public figures who had  chosen to speak about the treatment they had received from Dr. Lederman.  Notwithstanding Dr. Lederman's initial response, he did eventually agree that he would cease his publicity efforts.

28.     Significantly, at no time during this November 11th meeting did Dr. Lederman advise either Ms. Harrison or Mr. de Becker that he would be appearing the following morning –

- 7 -

November 12, 2001 – on CBS's nationally televised network program *The Early Show*, hosted by Bryant Gumbel.

29.     Even though he had agreed not to discuss Mr. Harrison with the press, Dr. Lederman's interview with Bryant Gumbel focused on Mr. Harrison and would never have occurred absent Dr. Lederman's association with Mr. Harrison.  Dr. Lederman did not deny being Mr. Harrison's physician, even though he had previously specifically agreed with Mr. Harrison and his security personnel not to discuss Mr. Harrison.  Indeed, in the interview Dr. Lederman established that he was well aware that both he and SIUH were under an obligation to protect Mr. Harrison's confidentiality and privacy:

> BRYANT GUMBEL:  George Harrison, who was diagnosed with lung cancer and a brain tumor earlier this year, reportedly has been receiving cancer treatments at Staten Island University Hospital. The hospital's director of radiation oncology is Dr. Gil Lederman. Dr. Lederman, good morning.

> DR. LEDERMAN:  Good morning.

> GUMBEL:  Can you confirm for us that you've been treating the former Beatle, George Harrison, as has been reported?

> LEDERMAN:  We don't speak about our patients or anyone else without their permission.

> GUMBEL:  Is – that's hospital policy or Mr. Harrison's wishes?

> LEDERMAN:  Well, it's the moral thing to do.  We wouldn't want to talk about you, your friends, and we don't talk about our patients without their permission.

30.     Moreover, in an unabashed display of self-promotion, Dr. Lederman used the interview with Bryant Gumbel and the opportunity for a national audience created solely by his association with Mr. Harrison to advertise his cancer treatment services:

> GUMBEL:  Is [your cancer treatment] still considered experimental and how widely is it -- is it being used or is it even available?

> LEDERMAN:  Staten Island University Hospital is the first hospital in the Western Hemishphere to offer body radiosurgery. We have more experience than anyone else worldwide.  And I believe that is why so many

- 8 -

people from across the United States and the world come here for cancer treatment.

*     *     *

GUMBEL:  Would Mr. Harrison be an ideal candidate for these kinds of treatments?

LEDERMAN:  I think many people would be ideal candidates for body radiosurgery.  In fact, we have a (800) number, 1-800-285-4584, for people to get information about our technique. . . .

31.     Not only did Dr. Lederman not have Mr. Harrison's permission to appear on this program or to speak about him, Dr. Lederman had the opposite:  a series of warnings, prohibitions, and direct instructions about confidentiality and an express requirement that he was not to discuss Mr. Harrison.  Nevertheless, by approaching the media and appearing on the nationally broadcast *The Early Show* on CBS, Dr. Lederman effectively let it be known to the world that George Harrison was his patient at SIUH.  Clearly, the media's interest in Dr. Lederman was as "George Harrison's doctor" and by doing interviews Dr. Lederman created a testimonial to his services and inappropriately sought to profit from his association with George Harrison over the objections of an unwilling patient who had relied on, and expected, complete confidentiality and privacy.

32.     Immediately after learning of this interview, Mr. de Becker asked Joseph Conti ("Mr. Conti"), a senior administrator of SIUH to convene a formal meeting with between Dr. Lederman and Dr. Schiff (another doctor treating Mr. Harrison).

33.     This meeting, which was attended by Dr. Lederman, Dr. Schiff, Mr. Conti and Mr. de Becker, was held on or about November 13, 2001.  During this meeting Dr. Lederman was again reminded of his obligation to maintain Mr. Harrison's confidentiality and privacy by not discussing Mr. Harrison.

- 9 -

34.     Dr. Lederman's response was that he could not be expected to refrain from publicity just because Mr. Harrison was his patient.  However, Mr. de Becker reminded him that he was only being invited to participate in such publicity because he was "George Harrison's doctor" and that was the only reason he was generating interest in himself or his cancer center.

35.     Furthermore, during this meeting, Mr. de Becker reminded Dr. Lederman that he was under a continuing obligation to maintain Mr. Harrison's confidentiality and privacy even if Mr. Harrison decided to discontinue his treatment with Dr. Lederman.

36.     Dr. Schiff, who was also participating in Mr. Harrison's treatment, said he would not participate in any interviews.  Likewise, Mr. Conti agreed to cease all interviews about any topic while Mr. Harrison was still in Staten Island.

37.     Nevertheless, despite Mr. de Becker's efforts at damage control at the November 13th meeting, Dr. Lederman's CBS interview opened the floodgates of publicity: paparazzi photographers descended on the hospital with offers of $250,000 for a photo of Mr. Harrison, reporters and photographers began following Ms. Harrison, their son Dhani and other family members, several reporters and photographers camped out on the street in front of a small hotel where some family members were staying and reporters went to Dr. Lederman's home.

38.     As a result of Dr. Lederman and SIUH's breaches of confidentiality and the publicity they generated, it became necessary for Mr. Harrison to substantially increase already costly security measures.

39.     In addition to Dr. Lederman's previous violations of the doctor-patient privilege, the most offensive, insensitive, bizarre, and inappropriate behavior by Dr. Lederman occurred in mid-November, 2001 – just two weeks before Mr. Harrison's death.  At the time Mr. Harrison had moved from SIUH to a private residence near the hospital.  At one point, at the end of Mr. Harrison's treatment, Dr. Lederman arrived at the Harrison's house without invitation with

- 10 -

his son, Ariel, and daughters, Daughter 1 and Daughter 2. Despite Mr. Harrison's deteriorating condition and the fact that he was bedridden, frail and in great discomfort, Dr. Lederman took his three children into Mr. Harrison's bedroom without permission.

40.     Notwithstanding his awareness of Mr. Harrison's illness and obvious infirmity, Dr. Lederman then had Mr. Harrison listen to Dr. Lederman's son play the guitar. Afterwards Dr. Lederman took the guitar he had brought with him and put it in Mr. Harrison's lap and asked Mr. Harrison to sign the guitar for his son Ariel.

41.     Mr. Harrison, who was weak and exhausted, resisted and said: "I do not even know if I know how to spell my name anymore." Dr. Lederman reached out to hold Mr. Harrison's hand to help him write said "come on, you can do this," and, spelled out Mr. Harrison's name for him, beginning with the letter "G," and continuing to spell the entire name, "E-O-R-G-E  H-A-R-R-I-S-O-N."

42.     At Dr. Lederman's insistence, Mr. Harrison painstakingly autographed the guitar with great effort and much obvious discomfort. After signing the guitar as a result of Dr. Lederman's coercive behavior, Dr. Lederman took the guitar from Mr. Harrison's lap. Then the doctor handed Mr. Harrison two cards and instructed him to autograph one for each of his daughters, which Mr. Harrison did as best he could.

43.     Thus, Dr. Lederman intentionally and willfully misused his fiduciary position as Mr. Harrison's physician to create exceedingly valuable collectors' items.

44.     Guitars associated with Mr. Harrison and other famous musicians have in the past fetched many hundreds of thousands of dollars at auction. For example, a guitar Mr. Harrison played early in his career recently was sold for more than $400,000. (*See* article attached hereto as Exhibit A). Dr. Lederman was well aware of the value of such items both in terms of an actual dollar figure and in connection with getting additional publicity for himself.

- 11 -

9901540\V-3

Moreover, he was also, on information and belief, aware that the value of such items would increase if they were signed on Mr. Harrison's "deathbed."

45.    Acting on such awareness, Dr. Lederman generated publicity that would predictably increase the guitar's value and attract media attention and Dr. Lederman in turn used such attention to promote himself.  Specifically, he falsely told the press:  "George [Harrison] invited me and my children into his home."  A picture of his son Ariel with the signed guitar appeared in the *National Enquirer* along with a story that included several quotes from Dr. Lederman, including his statement that Ariel's guitar contains "probably the very last [autograph Mr. Harrison] ever wrote", and the false statement that Mr. Harrison had stayed at Dr. Lederman's house.

46.    Moreover, in at least one interview, Dr. Lederman, falsely stated that Mr. Harrison had played Ariel's guitar.  On information and belief, this was done to further increase the value of the guitar.

47.    Despite Plaintiffs' repeated requests for the return of the autographed guitar and cards (or, alternatively, the removal of the autograph from these items) – all of which have been refused – these items, on information and belief, are currently in the possession of Dr. Lederman and/or his minor children.  Dr. Lederman has refused to provide any assurance that he will not attempt to further publicize himself through the guitar or autographed cards or sell these items.

48.    Shortly after Dr. Lederman's visit, Mr. Harrison left Staten Island for California, where he died soon thereafter on November 29, 2001. After he traveled to California, Mr. Harrison had no further contact with Dr. Lederman, who never even called Ms. Harrison to inquire about Mr. Harrison's condition or to offer his condolences.

- 12 -

49.     At no time after Mr. Harrison's death did Plaintiffs herein waive the doctor-patient privilege or any other protection for Mr. Harrison's confidentiality and privacy.

50.     However, starting within hours of Mr. Harrison's death, Dr. Lederman scheduled a series of interviews about Mr. Harrison.  In the space of just a few hours, Dr. Lederman appeared on, *inter alia*, NBC, ABC, CNN, and FOX News.  He also spoke with reporters from *Time, Newsweek, US,* and the *National Enquirer.*

51.     In these interviews, he falsely presented himself as having been a dear friend of Mr. Harrison's and revealed the most personal and confidential information, including information about Mr. Harrison's treatment, his pain, his mobility, his condition, and his attitudes about death, life, spirituality, and the atmosphere in the home at the time of his death (even though Dr. Lederman was not there).  Dr. Lederman revealed this information despite the fact that:  (a) any information he was privy to was acquired in the context of the doctor-patient relationship; and (b) he was specifically obligated by his agreement with Mr. Harrison to keep such information confidential.

52.     By way of example, Dr. Lederman provided information about Mr. Harrison's pain, including the self-serving and false statement that Mr. Harrison was not in pain after his treatments with Dr. Lederman:

> *PAULA ZAHN (CNN): His family, this morning, described him as dying in peace. In the end, physically, was he in pain?*
>
> *LEDERMAN: I don't believe he was in pain*

53.     By way of further example, hours after Mr. Harrison's death Dr. Lederman called in live to the ABC nationally broadcast morning show *Good Morning America* on November 30, 2001, and inappropriately revealed Mr. Harrison's spiritual views and thoughts on death and dying.  Despite breaching Mr. Harrison's privacy in this egregious manner, Dr. Lederman confirmed what the Harrisons had made repeatedly clear to him -- that Mr. Harrison

- 13 -

wanted his privacy protected.  Dr. Lederman told *Good Morning America* :  "[H]e was one of The Beatles who was craved by millions and yet all he sought was privacy."

54.     On information and belief, Dr. Lederman was not content to wait to have reporters come to him, but rather, went so far as to issue a press release, which was quoted in *Newsweek*.

55.     Some of what Dr. Lederman said was untrue, and there was at least one direct lie: When asked how he learned of Mr. Harrison's death, he said: "I was called Thursday night by his friends."

56.     As a result of these repeated and ongoing disclosures Mr. de Becker again contacted Mr. Conti and asked him:  "Tell me what I can do to make this stop now. Who do I need to speak with?"  Mr. Conti took responsibility and replied: "You're talking to him."

57.     Mr. Conti called Mr. de Becker back the next day and said that he had met with Dr. Lederman and impressed on him that he had "crossed the line" and that Dr. Lederman had agreed to stop appearing in the media.

58.     Dr. Lederman, however, did not stop.  In almost every newspaper and magazine article where Dr. Lederman was quoted, there appeared quotes from an "anonymous" source revealing specifics of Mr. Harrison's treatment.  Moreover, such information, which would have been known to only a small group of people who were treating Mr. Harrison at SIUH – including Dr. Lederman – was nearly always revealed in a way that enhanced Dr. Lederman's image.

59.     As a result of his egregious conduct, the New York State Department of Health Office of Professional Medical Conduct began a year-long investigation, conducting interviews with numerous witnesses.  On November 25, 2003, OPMC fined and publicly censured Dr. Lederman for his gross breaches of conduct.

- 14 -

60.     In light of Dr. Lederman and SIUH's previous violations of their respective promises to maintain Mr. Harrison's confidentiality and privacy, Plaintiffs have sought assurances that that they will respect the duties imposed on them.  However, Dr. Lederman and SIUH have refused to provide such assurances and, on information and belief, Dr. Lederman and SIUH will continue to make disclosures in derogation of such duties.

AS AND FOR A FIRST CAUSE OF ACTION
AGAINST DEFENDANT GILBERT LEDERMAN
(Negligence)

61.     Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1 through 60 as if set forth fully herein.

62.     Dr. Lederman repeatedly and in blatant violation of his duty to maintain the confidences of his patient, Mr. Harrison, disclosed confidential information that became known to him through his treatment of Mr. Harrison for cancer.

63.     The confidential information disclosed by Dr. Lederman included, *inter alia*, information about: the fact that Mr. Harrison was receiving treatment, his mental state, his physical state and the nature of the treatment he was receiving.

64.     At no time did Mr. Harrison or Plaintiffs waive the doctor-patient privilege.

65.     As a result of Dr. Lederman's breach of his duty to maintain the confidentiality of Mr. Harrison's medical information,  Mr. Harrison, suffered great emotional and psychological harm prior to his death for which Plaintiffs are entitled to recover.

9901540\V-3

### AS AND FOR A SECOND CAUSE OF ACTION
### AGAINST DEFENDANT SIUH
(Negligence)

66.    Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1

through 65 as if set forth fully herein.

67.    Agents, employees and/or individuals acting under the direction or control of

SIUH, including, but not limited to Dr. Lederman, repeatedly and in blatant violation of SIUH's

duty to maintain the confidences of its patient, Mr. Harrison, disclosed confidential information

that it became aware of through Dr. Lederman's treatment of Mr. Harrison for cancer.

68.    The confidential information disclosed included, *inter alia*, information about:

the fact that Mr. Harrison was receiving treatment at SIUH, his mental state, his physical state

and the nature of the treatment he was receiving.

69.    At no did Mr. Harrison or Plaintiffs waive the doctor-patient privilege.

70.    As a result of SIUH's breach of its duty to maintain Mr. Harrison's

confidential medical information, Mr. Harrison, suffered from great emotional and psychological

harm prior to his death for which Plaintiffs are entitled to recover.

### AS AND FOR A THIRD CAUSE OF ACTION
### AGAINST DEFENDANT GILBERT LEDERMAN
(Breach of Fiduciary Duty)

71.    Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1

through 70 as if set forth fully herein.

72.    By virtue of the nature of the doctor-patient relationship, Dr. Lederman was a

fiduciary to Mr. Harrison and, as a result, he was required to maintain the confidences disclosed

to him by Mr. Harrison and place Mr. Harrison's interests before his own.

73.    Notwithstanding these duties, Dr. Lederman repeatedly disclosed Mr.

Harrison's confidential medical and personal information to the media and placed his own

interests first while ignoring the fact that his actions caused Mr. Harrison obvious pain.  Dr. Lederman also abused his fiduciary position with Mr. Harrison by promoting himself to the media in an effort to enhance his professional reputation.  In addition, Dr. Lederman abused his fiduciary position with Mr. Harrison by taking advantage of his condition and by coercing him to autograph the guitar and the cards in order to create for Dr. Lederman uniquely valuable assets.

74.     As a result of Dr. Lederman's unfaithful conduct, Mr. Harrison suffered great emotional and psychological harm and Plaintiffs have suffered injury for which Plaintiffs are entitled to recover.

AS AND FOR A FOURTH CAUSE OF ACTION
AGAINST DEFENDANT SIUH
(Breach of Fiduciary Duty)

75.     Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1 through 74 as if set forth fully herein.

76.     By virtue of the nature of the doctor-patient relationship, SIUH  was a fiduciary to Mr. Harrison and, as a result, it was required to maintain confidences disclosed to it by Mr. Harrison and place Mr. Harrison's interests before its own.

77.     Notwithstanding these duties, SIUH, acting through its agents, employees and/or individuals under SIUH's direction or control, including, but not limited to Dr. Lederman, repeatedly disclosed Mr. Harrison's confidential medical information to the media and placed its own interests in the forefront, for example, by disclosing information about Mr. Harrison to promote its programs and thereby attract additional patients and revenue to SIUH, even when its caused Mr. Harrison obvious pain.

78.     As a result of SIUH's unfaithful conduct, Mr. Harrison suffered great emotional and psychological harm and Plaintiffs have suffered injury for which Plaintiffs are entitled to recover.

- 17 -

### AS AND FOR A FIFTH CAUSE OF ACTION
### <u>AGAINST DEFENDANT GILBERT LEDERMAN</u>
### (Breach of Contract)

79.     Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1 through 78 as if set forth fully herein.

80.     As a result of Dr. Lederman's repeated promises to maintain his confidentiality and privacy, Mr. Harrison agreed to accept and continue medical treatment with Dr. Lederman at SIUH.

81.     Notwithstanding these repeated promises, Dr. Lederman disclosed confidential and private information about Mr. Harrison, including, *inter alia*, the fact that Mr. Harrison was receiving treatment at SIUH, his mental state, his physical state and the nature of the treatment he was receiving.

82.     As a result of Dr. Lederman's breach of his promises, Mr. Harrison was injured and Plaintiffs are entitled to recover for this injury.

### AS AND FOR A SIXTH CAUSE OF ACTION
### <u>AGAINST DEFENDANT SIUH</u>
### (Breach of Contract)

83.     Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1 through 82 as if set forth fully herein.

84.     As part of the course of treatment SIUH agreed to provide Mr. Harrison, SIUH undertook to keep all information relating to Mr. Harrison strictly confidential and to exercise particular care with respect to personnel under its supervision to ensure Mr. Harrison's privacy.

85.     Notwithstanding its repeated promises, SIUH failed to exercise such care and as a result confidential information was disclosed.

- 18 -

86.     As a result of SIUH's breach of its promises and obligations, Mr. Harrison was injured and Plaintiffs are entitled to recover for this injury.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## AGAINST DEFENDANT DR. LEDERMAN
(Unjust Enrichment)

87.     Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1 through 86 as if set forth fully herein.

88.     By the virtue of the nature of the relationship between Dr. Lederman and Mr. Harrison, Dr. Lederman was required to act with the utmost good faith toward Mr. Harrison.

89.     Notwithstanding this duty, Dr. Lederman repeatedly used his position and association with Mr. Harrison to promote himself and his medical practice in the media.

90.     On information and belief, Dr. Lederman was enriched as a result of shameless self-promotion.  This enrichment includes, but is by no means limited, to the value of the media time that Dr. Lederman received by promoting his association with Mr. Harrison.  In light of the nature of his relationship with Mr. Harrison and the suffering he caused Mr. Harrison by repeatedly revealing his confidential medical information, it would be inequitable to permit Dr. Lederman to retain theses profits.

91.     Moreover, Dr. Lederman was enriched by abusing his position as Mr. Harrison's physician in coercing the creation of the autographed guitar and cards, which are unique items of enormous value.  It would be inequitable to permit Dr. Lederman to retain these valuable items or the profits therefrom.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## AGAINST DEFENDANT SIUH
(Unjust Enrichment)

92.     Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1 through 91 as if set forth fully herein.

9901540\V-3

93.     By the virtue of the nature of the relationship between SIUH and Mr. Harrison, SIUH was required to act with the utmost good faith toward Mr. Harrison.

94.     Notwithstanding this duty, SIUH repeatedly used its position and association with Mr. Harrison to promote itself in the media.

95.     On information and belief, SIUH was enriched as a result of this media exposure.  This enrichment includes, but is not limited to, the value of the media time that SIUH, acting through its agents, employees and/or individuals under its direction or control, received by using SIUH's association with George Harrison.  In light of the nature of the relationship between Mr. Harrison and SIUH and the suffering SIUH caused Mr. Harrison by repeatedly revealing his confidential medical information, it would be inequitable to permit SIUH to retain theses profits.

AS AND FOR A NINTH CAUSE OF ACTION
<u>AGAINST DEFENDANT GILBERT LEDERMAN</u>
(Reckless Infliction of Emotional Distress)

96.     Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1 through 95 as if set forth fully herein.

97.     Dr. Lederman disclosed confidential and private information about Mr. Harrison in his last weeks of life and did so not only against  Mr. Harrison's express wishes, but also in violation of his duty to Mr. Harrison.  Moreover, Dr. Lederman continued to make such disclosures even after he was made aware that he was causing Mr. Harrison great anguish and repeatedly told to stop.

98.     Dr. Lederman did not make these disclosures to just a few people.  Rather, he appeared on nationwide television and in widely circulated newspapers and magazines.

99.     Dr. Lederman's outrageous conduct was extremely upsetting to Mr. Harrison as it revealed a complete lack of decency and concern for Mr. Harrison's welfare and wishes.

9901540\V-3

100.    Plaintiffs are entitled to recover for the emotional distress Dr. Lederman recklessly inflicted on Mr. Harrison.

AS AND FOR A TENTH CAUSE OF ACTION
<u>AGAINST DEFENDANT SIUH</u>
(Reckless Infliction of Emotional Distress)

101.    Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1 through 100 as if set forth fully herein.

102.    SIUH through its agents, employees and/or individuals acting under its direction and control, including but not limited to Dr. Lederman, disclosed confidential and private information about Mr. Harrison in his last weeks of life and did so not only against Mr. Harrison's express wishes, but also in violation of its duty to Mr. Harrison.  Moreover, SIUH continued to make such disclosures even after it was made aware that it was causing Mr. Harrison great anguish and repeatedly told to stop.

103.    These disclosures were not made to a handful of people, but rather appeared in national media outlets.

104.    SIUH's outrageous conduct was extremely upsetting to Mr. Harrison as it revealed a complete lack of decency and concern for his welfare and wishes.

105.    Plaintiffs are entitled to recover for the emotional distress SIUH recklessly inflicted on Mr. Harrison.

AS AND FOR AN ELEVENTH CAUSE OF ACTION
<u>AGAINST DEFENDANT GILBERT LEDERMAN</u>
(Imposition of a Constructive Trust)

106.    Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1 through 105 as if set forth fully herein.

- 21 -

107.    Dr. Lederman coerced Mr. Harrison to autograph a guitar for Dr. Lederman's son, Ariel, shortly before Mr. Harrison's death.  The autograph on this guitar was obtained as a result of wrongful and coercive conduct by Dr. Lederman.

108.    Dr. Lederman coerced Mr. Harrison to autograph cards for Dr. Lederman's daughters, Daughter 1 and Daughter 2.  These autographs were obtained as a result of wrongful and coercive conduct by Dr. Lederman.

109.    Dr. Lederman acted in this manner despite the fact that, because of the nature of his relationship with Mr. Harrison, he was under an obligation to exercise the utmost good faith toward Mr. Harrison.

110.    On information and belief, the guitar signed by Mr. Harrison as a result of Dr. Lederman's misconduct is in the possession of Dr. Lederman or his minor son, Ariel.  On further information and belief, if Dr. Lederman is allowed to retain the guitar, he will use it to further promote himself and to profit at the expense of the doctor-patient relationship.

111.    On information and belief, the cards autographed by Mr. Harrison as a result of Dr. Lederman's misconduct are in the possession of Dr. Lederman or his minor daughters.  On further information and belief, if Dr. Lederman is allowed to retain these cards, he will use them to further promote himself and to profit at the expense of the doctor-patient relationship.

112.    As a result of the nature of the relationship between Dr. Lederman and Mr. Harrison, Dr. Lederman's abuse of his position and the fact that Dr. Lederman would be unjustly enriched if he is allowed to retain the guitar and cards, a constructive trust comprised of the guitar and cards should be imposed in favor of Plaintiffs.

- 22 -

## AS AND FOR A TWELFTH CAUSE OF ACTION
## <u>AGAINST DEFENDANT GILBERT LEDERMAN</u>
### (Recovery of Chattel)

113.    Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1

through 112 as if set forth fully herein.

114.    Plaintiffs have repeatedly demanded that Dr. Lederman turn over the guitar

and cards with Mr. Harrison's autograph.  Moreover, Plaintiffs have offered to provide a new,

unsigned guitar, in exchange for the return of the one with Mr. Harrison's autograph.  However,

despite these repeated requests, Dr. Lederman has refused to provide the guitar and cards to

Plaintiffs.

115.    As Dr. Lederman misused his relationship with Mr. Harrison to obtain the

autographs on the guitar and cards, Plaintiffs have a superior right to possess the guitar and

cards.

116.    In the alternative, as Dr. Lederman misused his relationship with Mr. Harrison

to obtain these autograph on the guitar and cards, Plaintiffs have a superior right to possess the

autographs.

117.    Also in the alternative, Plaintiffs seek damages in the amount of the value of

the guitar and cards, the value of the publicity obtained by Dr. Lederman as a result of his

possession of the guitar and cards and the pain and suffering caused by his misusing his position

to first obtain the guitar and cards and then publicize himself by using them.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
## <u>AGAINST DEFENDANTS ARIEL LEDERMAN, DAUGHTER 1 AND DAUGHTER 2</u>
### (Recovery of Chattel)

118.    Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1

through 117 as if set forth fully herein.

- 23 -

9901540\V-3

119.   Plaintiffs have repeatedly demanded that Dr. Lederman turn over the guitar and cards with Mr. Harrison's autograph.  Moreover, Plaintiffs have offered to provide a new, if unsigned guitar, in exchange for the return of the one with Mr. Harrison's autograph.  However, despite these repeated requests, Dr. Lederman has refused to provide the guitar and cards to Plaintiffs citing, among other things, that he is unable to return these items as they are in the possession of his minor children.

120.   As Dr. Lederman misused his relationship with Mr. Harrison to obtain the autograph on the guitar and cards, Plaintiffs have a superior right to possess the guitar and cards and, in equity, Dr. Lederman should not be allowed to hide behind his minor children.

121.   In the alternative, as Dr. Lederman misused his relationship with Mr. Harrison to obtain the autographs on the guitar and cards, Plaintiffs have a superior right to possess the these autographs and, in equity, he should not be allowed to hide behind his minor children.

122.   Also in the alternative, Plaintiffs seek damages in the amount of the value of the guitar and cards, the value of the publicity obtained by Dr. Lederman as a result of his possession of the guitar and cards and the pain and suffering caused by his misusing his position to first obtain the guitar and cards and then publicize himself by using them.

### AS AND FOR A FOURTEENTH CAUSE OF ACTION
### AGAINST DEFENDANTS GILBERT LEDERMAN AND SIUH
(Permanent Injunctive Relief)

123.   Plaintiffs hereby repeat and reallege the allegations contained in paragraphs 1 through 122 as if set forth fully herein.

124.   In light of Dr. Lederman and SIUH's previous violations of their respective promises to maintain Mr. Harrison's confidentiality and privacy, Plaintiffs have sought assurances that that they will respect the duties imposed on them.  However, Dr. Lederman and

SIUH have refused to provide such assurances and, on information and belief, Dr. Lederman and SIUH will continue to make disclosures in derogation of such duties.

125.    Plaintiffs have no adequate remedy at law for these violations of Defendants Gilbert Lederman and SIUH's duties and unless Defendants are restrained from making disclosures in derogation of their duties, Plaintiffs will suffer irreparable injury.

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

(a)     On the first through tenth claims for relief, awarding compensatory damages in an amount not less than Ten Million Dollars ($10,000,000) and punitive damages, the exact amount of compensatory and punitive damages to be determined at the trial of this action;

(b)     On the eleventh claim for relief, imposing a constructive trust for the benefit of Plaintiffs, the *res* of which consists of the guitar and autographed cards that were wrongfully and coercively obtained by Dr. Lederman in derogation of his duties to his patient;

(c)     On the twelfth and thirteenth claims for relief, the surrender to Plaintiffs of the autograph guitar and cards that were wrongfully and coercively obtained by Dr. Lederman in derogation of his duties to his patient;

(d)     On the fourteenth cause of action, a permanent injunction barring Dr.

Lederman and SIUH from directly or indirectly mentioning or discussing Mr. Harrison in

derogation of their duties to their patient; and

(e)     Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
        January 13, 2004

SONNENSCHEIN NATH & ROSENTHAL LLP

By: *Paul V. LiCalsi/* 

Paul V. LiCalsi (PVL-6622)
Matthew L. Lifflander (MLL-7087)
Howard H. Weller (HHW-2745)
Emily A. Poler (EAP-1551)
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700

*Attorneys for Plaintiffs*

- 26 -

9901540\V-3